NOT PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 23-2572
_____

RENE BENJAMIN BAUTISTA-ROSALES; SARA IVETH TORRES-MONTESINOS;
C. B.; S. B.,

Petitioners

v.

ATTORNEY GENERAL OF THE UNITED STATES OF AMERICA
_____

On Petition for Review of an Order of the
Board of Immigration
(BIA 1:A208-981-659; 1:A208-982-696;
1:A208-981-660; and 1:A208-982-697)
Immigration Judge: Honorable John B. Carle
_____

Submitted Under Third Circuit L.A.R. 34.1(a)
June 24, 2024

Before: JORDAN, McKEE, and AMBRO, *Circuit Judges*

(Filed: June 28, 2024)
_____

OPINION*
_____

_____

* This disposition is not an opinion of the full court and, pursuant to I.O.P. 5.7,
does not constitute binding precedent.

JORDAN, *Circuit Judge*.

Rene Benjamin Bautista-Rosales, his domestic partner, Sara Iveth Torres-Montesinos, and their two minor children, C.B. and S.B. (collectively, the "Petitioners"), petition for review of an order of the Board of Immigration Appeals ("BIA") denying their requests for asylum, withholding of removal, and relief under the Convention Against Torture ("CAT"). We will deny the petition.

## I.    BACKGROUND[1]

The Petitioners are natives and citizens of El Salvador. Prior to their departure from that country in 2016, Bautista-Rosales worked on a farm owned by Torres-Montesinos's father. The farm was "eight square blocks" on which Bautista-Rosales grew crops and tended to livestock. (A.R. at 129.)

In or around 2014, members of the Mara Salvatrucha gang, commonly known as MS-13, called Bautista-Rosales and demanded that he pay them $1,000 within a week's time. He filed a police report after receiving the call, but, in his view, the police did not "do[] anything about it." (A.R. at 133.) A week later, members of MS-13 called Bautista-Rosales again and told him that they were "serious" and "not joking around," and they told him his name, his domestic partner's name, and where he worked. (A.R. at 133.) The following week, the gang called Bautista-Rosales again and doubled the demand amount to $2,000 because he still had not paid them. He went back to the police,

---

[1] These background facts are drawn from the administrative record and are accepted as true for purposes of this decision.

2

but they told him that there were no "next steps" for them to take because they had not "been alerted to" any criminal activity directed at him. (A.R. at 134.) They instructed him to remain calm and to stay indoors as much as possible. Two days later, Bautista-Rosales sold off some of his livestock and used the money to travel to the United States with C.B. Shortly thereafter, Torres-Montesinos sold off more animals, and she and S.B. joined Bautista-Rosales in the United States.

In April 2016, the Department of Homeland Security initiated removal proceedings against the Petitioners for unlawfully entering the United States. The Petitioners conceded removability and applied for asylum, withholding of removal, and CAT relief. Before the immigration judge (the "IJ"), they argued that they had been persecuted by MS-13 in El Salvador because they were "Salvadoran small farmers[,]" that they had a well-founded fear of future persecution, and that they would likely be persecuted and tortured if they returned to El Salvador. (A.R. at 68.)

At a merits hearing, Bautista-Rosales testified that he left El Salvador "[b]asically … due to the delinquency that is over there[.]" (A.R. at 130.) In particular, he asserted that two of his family members had been killed by MS-13.[2] "Then added to that," he said, "[were] the phone calls" from MS-13. (A.R. at 130.) He explained that he thought

---

[2] He testified that his uncle, who "was in the business of … buying and selling … livestock[,]" was murdered by robbers in 2013, and also that one of his father's cousins had been killed in 2015, while he was leaving a farm near the one Bautista-Rosales worked at. (A.R. at 131.) Bautista-Rosales also testified that, after he left El Salvador, an employee who had worked under him on the farm was killed, off farm premises, by a masked person during the night. At the hearing, Bautista-Rosales asserted that the employee's killing likely had some connection to him because the employee worked with him for four years.

3

he was targeted by MS-13 because they assumed he "ha[d] some money" because he owned livestock. (A.R. at 137.) As to his fear of returning to El Salvador, Bautista-Rosales testified: "[I]f I were to have to go back, … the same situation is going to end up happening. You know, let's say I [start] a little business or a little store, … once again they're going to come after me demanding money because I've put up a store[.]" (A.R. at 139.)

The IJ denied the Petitioners' applications for asylum, withholding of removal, and CAT relief in their entirety. He concluded that the telephone calls Bautista-Rosales received did not rise to the level of persecution], that "Salvadoran small farmers" is not a legally-cognizable particular social group (A.R. at 89-90), and that the Petitioners did not establish a nexus between the harm they fear and their status as small farmers The IJ also found that the Petitioners did not meet their burden to establish that it is more likely than not that they would be persecuted or tortured if they returned to El Salvador.

On review, the BIA adopted and affirmed the IJ's decision for the reasons the IJ set forth in his opinion. The Petitioners timely filed the present petition for review.

## II.    DISCUSSION[3]

To be eligible for asylum, an alien must be a "refugee," 8 U.S.C. § 1158(b)(1)(A), which is defined as a person who has suffered past persecution or has a well-founded fear

---

[3] The BIA had jurisdiction under 8 U.S.C. § 1103 and 8 C.F.R. § 1003.1(b)(3). We have jurisdiction pursuant to 8 U.S.C. § 1252(a)(1). We review the BIA's legal determinations de novo, and we review its underlying factual findings for "substantial evidence." *S.E.R.L. v. Att'y Gen.*, 894 F.3d 535, 543 (3d Cir. 2018). Under the substantial evidence standard, we must "uphold the agency's determination unless the evidence would compel any reasonable fact finder to reach a contrary result." *Sesay v.*

of future persecution due to his "race, religion, nationality, membership in a particular social group, or political opinion," 8 U.S.C. § 1101(a)(42)(A).

The Petitioners assert that they were persecuted because they belong to a particular social group – namely, Salvadoran "small-scale farmers." (Opening Br. at 11.) But Bautista-Rosales testified at the merits hearing that he thought members of MS-13 targeted him because they assumed he had money. And the Petitioners concede "[t]hat gangs extort all manner of successful business persons in addition to small-scale farmers[.]" (Opening Br. at 21.) Nevertheless, the Petitioners say that there is no contradiction in their argument because, in their view, all they must show is that "the persecutors' motive in targeting the [particular social group in question] [was] based on that [group]'s characteristics[,]" and a characteristic applicable to small-scale farmers is "persons with financial resources[.]" (Opening Br. at 21-22.)

The Petitioners' argument is foreclosed by our precedent. We have been clear that violence motivated "by a desire to reap financial rewards" is "ordinary criminal activity [that] does not rise to the level of persecution necessary to establish eligibility for asylum." *Abdille v. Ashcroft*, 242 F.3d 477, 494 (3d Cir. 2001). There is substantial evidence, including Bautista-Rosales's testimony, to support the IJ's finding that he was targeted by MS-13 members because they assumed he had financial resources, and not

---

*Att'y Gen.*, 787 F.3d 215, 220 (3d Cir. 2015). When the BIA has adopted and affirmed the IJ's decision, we review both the IJ and BIA opinions. *Shehu v. Att'y Gen.*, 482 F.3d 652, 657 (3d Cir. 2007).

because he was a small-scale farmer. Accordingly, the Petitioners have not met their burden to show that the threats they received were due to their proffered particular social group.[4]

Even if there were a nexus between the particular social group that the Petitioners advance and the threats Bautista-Rosales received, the IJ's finding – adopted by the BIA – that the threats do not rise to the level of persecution are also supported by substantial evidence. Persecution, for purposes of asylum, "does not encompass all treatment that our society regards as unfair, unjust, or even unlawful or unconstitutional." *Lukwago v. Ashcroft*, 329 F.3d 157, 167-68 (3d Cir. 2003). "Rather, we have defined persecution as including threats to life, confinement, torture, and economic restrictions so severe that they constitute a real threat to life or freedom." *Blanco v. Att'y Gen.*, 967 F.3d 304, 311 (3d Cir. 2020) (internal quotation marks omitted).

Furthermore, "we have limited the type of threats constituting persecution to only a small category of cases, and only when the threats are so menacing as to cause significant actual suffering or harm." *Chavarria v. Gonzalez*, 446 F.3d 508, 518 (3d Cir. 2006) (internal quotation marks omitted). "Thus, we have refused to extend asylum protection for threats that, while sinister and credible in nature, were not highly imminent

---

[4] For the same reasons, the Petitioners have not shown that any fear of future persecution is a result of their status as small-scale farmers. Indeed, Bautista-Rosales admitted at the hearing that his situation would fare no better if he opened a business after returning to El Salvador. Because we conclude that there is no nexus between the threats that Bautista-Rosales received and the Petitioner's asserted particular social group of small-scale farmers in El Salvador, we need not determine whether such a group is legally cognizable.

or concrete or failed to result in any physical violence or harm to the alien." *Id.* The threats Bautista-Rosales received were not sufficiently imminent or concrete. While we are sympathetic to the Petitioners' plight, we cannot say that the IJ and the BIA erred in deciding that the threats did not rise to the level of persecution. Thus, the Petitioners' asylum claims are unsuccessful for that reason as well.

The Petitioners' withholding of removal claims also fail. "To qualify for withholding of removal, an alien must establish a clear probability of persecution, i.e., that it is more likely than not, that []he would suffer persecution upon returning home." *Valdiviezo-Galdamez v. Att'y Gen.*, 663 F.3d 582, 591 (3d Cir. 2011) (internal quotation marks omitted). "Since th[at] standard is more demanding than that governing eligibility for asylum," the Petitioners are "necessarily ineligible for withholding of removal" because they fail to qualify for asylum. *Id.*

Finally, the Petitioners' effort to obtain CAT relief fares no better. To obtain such relief, the applicant must "establish that it is more likely than not that he or she would be tortured if removed[,]" 8 C.F.R. § 1208.16(c)(2), and that the torture would be "inflicted by, or at the instigation of, or with the consent or acquiescence of, a public official acting in an official capacity or other person acting in an official capacity[,]" 8 C.F.R. § 1208.18(a)(1). The Petitioners argue that they will likely be tortured if they return to El Salvador because "[t]hey were singled out" by the MS-13, and because the government's failure to investigate the threats that Bautista-Rosales received "constitutes acquiescence." (Opening Br. at 25-26.) But such assertions are hypothetical. As the IJ noted, the Petitioners were not tortured in the past and they advance only a speculative

7

assertion that MS-13 will find and torture them upon return to El Salvador and that the police will not intervene.

At bottom, the Petitioners have not advanced any argument that would compel us to set aside the conclusion that they failed to show they would more likely than not experience torture if they returned to El Salvador.

## III.    CONCLUSION

For the foregoing reasons, we will deny the petition for review.